IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

United States of America 4:22-CR-02082-RM-EJM-11

vs.

Kyle Rene Fazlollah (11),

Defendant.

April 11, 2024
Tucson, Arizona

REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

SENTENCING

BEFORE THE HONORABLE ROSEMARY MÁRQUEZ
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S

For the Government:

Brandon Michael Bolling
United States Attorney's Office
405 West Congress Street
Tucson, Arizona 85701

For the Defendant:

David A. Aguilar
Law Office of David A. Aguilar
125 East Mabel Street
Tucson, Arizona 85705

Court Reporter: Erica R. McQuillen, RDR, CRR
Official Court Reporter
405 W. Congress Street
Tucson, Arizona 85701
(520)205-4267

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

P R O C E E D I N G S

THE CLERK: CR-22-2082, United States vs. Kyle Rene Fazlollah, on for sentencing.

Counsel, state your appearances, please.

MR. BOLLING: Good morning again, Judge Márquez. Brandon Bolling for the Government.

THE COURT: Good morning.

MR. AGUILAR: And good morning, Your Honor. David Aguilar on behalf of Kyle Rene Fazlollah. He's present, Your Honor, and in the courtroom.

THE COURT: Good morning. And good morning, Mr. Fazlollah.

THE DEFENDANT: Good morning, ma'am.

THE COURT: Please come forward with your attorney.

Mr. Fazlollah, you have pled guilty before the magistrate judge. This Court has made a finding that your plea was made knowingly, intelligently, and voluntarily, and based on that plea of guilty, it is the judgment of the Court that you are guilty of the offense of conspiracy to smuggle goods from the United States --

THE DEFENDANT: Yes, ma'am.

THE COURT: -- a class D felony.

THE DEFENDANT: Oh, sorry.

THE COURT: That's okay.

Mr. Aguilar, have you had an opportunity to read and

discuss the presentence report and the recommendation section with Mr. Fazlollah?

MR. AGUILAR: I have, Your Honor.

THE COURT: And do you believe he understands those documents?

MR. AGUILAR: I believe so, Your Honor.

THE COURT: Mr. Fazlollah, have you been satisfied with the services of your attorney?

THE DEFENDANT: Yes ma'am.

THE COURT: Has he answered all your questions regarding the case and the hearing here today?

THE DEFENDANT: Yes, ma'am.

THE COURT: Has he answered all your questions regarding the presentence report and the recommendation section?

THE DEFENDANT: Yes, ma'am.

THE COURT: And Mr. Aguilar, are there any objections or corrections?

MR. AGUILAR: No, Your Honor.

THE COURT: Any from the Government?

MR. BOLLING: No, Your Honor.

THE COURT: I have reviewed the presentence report and the recommendation section. I will order that it be made part of the record. I find that it accurately calculates the advisory guidelines as follows. There is a total offense

level of 23. Mr. Fazlollah does not have any criminal history points, and therefore your criminal history category is I, for an advisory guideline range of 46 to 57 months.

The parties have entered into a plea agreement that provides for a sentence of anywhere from the time you have already served up to the 46 months. I did read the letters that were submitted to the Court and the pretrial services report.

And with that, Mr. Aguilar, any statement you'd like to make on your client's behalf?

MR. AGUILAR: Yes, Your Honor.

With the Court's permission, in the preparation of presentence report, we reserved this communication, conversation, as to what happened for today, and with your permission, I would like for you to allow Kyle to speak first and then for me to speak second.

THE COURT: Sure. Mr. Fazlollah, anything you'd like to say?

THE DEFENDANT: I messed up. I did. I accept complete, full responsibility of everything I did. I've learned from it a lot. I can't do anything now to change it. In the last about couple weeks or so, it really started hitting me, everything that was going on and all that stuff, and I started hanging out with my kids a lot more. And don't get me wrong, I've always hung out with my kids a lot, but in

the last couple weeks, I've really started learning -- not learning but hanging out with them a lot more and stuff. Just realized what kind of impact it's going to have on them and just how I'm going to miss them a lot, more than anything.

We adopted -- me and my fiancée adopted her brother and sister, and -- we adopted her brother and sister. So they had already came from a mom who was all cracked out. The dad, we got them because he started beating on his lady. That's when we got them from CPS. So they already have known all this, so we adopted them to try to get them away from all that stuff, and that's why I just -- I feel real bad. I feel awful, awful, for just the fact that now I'm putting them through that again.

I don't really know how to say it, just I know it's -- this won't only affect me. I know it's something really serious and everything, and I'm real sorry to -- sorry to my mom, my dad, my fiancée, especially my kids a lot because there's a real good chance I'm probably not going to be able to see them for a while or anything.

We talked about that a couple weeks -- well, about a week ago, two weeks ago, and then -- and then this weekend, last weekend, we had a barbecue at the house, and again last night, so I was hanging out with them, and we just all cried a lot about how everything's going to be a lot different.

There's -- I made sure that, if stuff does go bad

I've already set up all the help, money set up for them, help and everything, but I know it's going to be a lot different for my kids. I got -- her little brother is 15, her little sister is 12, and my son's two. So it's -- we all cried a lot, and my fiancée a lot too.

But I understand it's a real serious crime, and I learned my lesson. I can -- people say that all the time, they learned their lesson. I can truthfully say I learned my lesson, especially hanging out with my kids, realized I'm not going to be with my kids. I'm not going to be around them. I'm not -- one thing about me is people always try to bring their kids to visit them and all that kind of stuff. I don't want them to see that because these kids have already been through so much with their mom and their dad. I'm trying to show them that this ain't normal or this isn't normal and stuff. It's not okay just to do that kind of stuff.

I realize I've messed up a lot and just real sorry, real sorry, and -- for everyone, all my family, everyone involved, and I accept full responsibility. Last thing I'm saying is, oh, this ain't no one's fault. No, I know I did it. I know completely I'm the one that messed up and everything, so it's not no one else's fault but mine.

It's just -- it's really hard when you go hang out with your kids a lot, especially for the time you have before whatever happens, that it really starts to hit you a lot. It

hits you a lot. Because in the last couple weeks I've -- about a week or -- last week I took off the rest of the time off work.

And just -- I can't do nothing about it now other than accept responsibility and do whatever I can to fix it and at least show them after, when I get out, to be better, better than me, be better than me and be better for sure -- well, be better than the mom and dad and now for sure be better than me, try to do whatever I can to show them.

In the last -- we've known this was coming for about around three years. Over three years I haven't got in trouble or nothing at all, not a single bit. I got some -- I'm not the best driver, I'll admit that, so I got like a speeding ticket, but other than that, I haven't been doing nothing at all, nothing. Just been hanging out nonstop a lot with my kids, nonstop with my kids.

That's really -- that's really all I wanted to say.

THE COURT: Thank you, sir.

Mr. Aguilar?

MR. AGUILAR: Your Honor, in July of 2020, and we're dating it back way before the indictment actually came down, we knew that this was going to happen. And how did we know this? Well, ATF paid a visit to one of the codefendants, and obviously Kyle's name came up, and the rest is somewhat history.

From that point on and continuing -- this has always been a serious crime. I mean, I think a lot of these younger individuals, whether they're straw purchasers or whether they're sent with money to pay, to purchase, it's all the same. It's all an organization of trying to get guns, rifles, pistols, that they're not going to be used other than a bad purpose, end of story.

Now, I don't want to spread blame, Your Honor, but sometimes these gun shops, these sellers, they make -- there's like no check and balance of who can walk in, who can't, who buys. They pay in cash. It doesn't make any excuses for Kyle because he got himself involved in doing this, okay, more than once, but at the same time, he's not blaming anybody. He's not coming in here and saying it's somebody's fault or somebody's fault. No. It's his fault. He's owned up to what he did. And I give him credit for that.

Number two, from that time, Your Honor, aside from dealing with the really serious medical issues that pop up whenever they want to pop up, he's held his own in terms of working, in terms of staying clean, in terms of completely eliminating the group of people that he used to hang around with. And it's showing. I mean, it's showing. You can see here, Your Honor, that he has a very large backing of individuals that care enough to write letters and/or come and stand with him. They want to help him just as much as

probation or anyone.

The real question here, Your Honor -- and as I look at this case, the recommendation was for 12 months and a day, and 12 months and a day is, with good time, 10 months, with three years of supervised release. I have another option, Your Honor, that the Court could instill. Many, many times people come in front of you and they ask, just give me probation, I don't want to go to jail. But what they don't realize is that the provisions and the conditions imposed on probation are very, very strict and very difficult to achieve. And many, many people, so to say, bite the apple, mess up, come back, and go to prison.

In this particular case, Your Honor, I'm going to ask you to deviate a bit. Number one, I'm going to ask you that, if you do put him on probation, that it would extend for five years, and unless there was some really, really extraordinary conditions being imposed, that he can't terminate early, that it is -- that's part of his so-called sanctions for his behavior at this period of time.

Also, Your Honor, as a condition, to make sure that Kyle understands that, if he messes up, he is going to prison. Now, by a home arrest, it is a prison. If you shorten a period of time so that he learns what it is to be in prison, he's going to think twice about any sort of violations. And it goes together. The idea here is to make sure that there's

never going to be a return to the lifestyle that he had. This is also a felony conviction that's a federal felony conviction, that's aggravated, that's going to be very difficult to try to set aside or not deal with in his entire life.

One of the pluses that Kyle has, Your Honor, and it's a big plus, is his mom and dad. They stood behind him 100 percent, regardless of all of what's been going on. Kyle has been blessed with hard-working parents that have a successful business that allows him to work. And we had many conversations, Kyle and I, as to, well, what happens to your dad? Who's going to run -- who's going to run the business? I mean, he would love to pass the baton to his son, and he is the only son. Well, he has to own up, period.

What brought him here, believe it or not, is like a 360-degree circle because one of the codefendants, Victor Coronado, actually got a job there, and that's where the relationship started. They were I don't know how many years apart, 17, 18 years apart, but he never forced -- Victor never forced my client to do anything. No one ever forced my client to do anything. He did it himself. Now he pays a price.

I've seen this young man grow up, Your Honor. I've lectured him. I've argued with him. And I'm hoping that during all those times of arguments and at presentation that there is a different way of life, a good way, to be on the

right side. He has all the opportunities.

This is the other thing I told him. You know how many people come in front of the federal courts that have the opportunity to -- that he has waiting for him? Very few. Okay? So he can't botch it anymore. He's already botched it. So he can't botch it again. If he does, if he does get another bite at the apple and he does violate for whatever reason, no one's going to listen to him, Your Honor. I'm not going to listen to him. I'm sure the Court will listen but not agree.

So all he's asking this time around is, for the reasons stated forth, that he be given that opportunity and prove to the Court and prove to himself that that person back in 2019-2020 does not exist.

I want to just close, Your Honor, with two things. One is, the medication that he's taking is a pretty serious type medication, and we want to make sure that, if he is incarcerated, that we have the avenues to get those to him.

The last request, Your Honor, because the entire family is in the Tucson area, we would ask that, if he's going to have to do prison time, that he could perhaps do it at the Safford correctional facility, which is close. But that's only if he failed in every other type of situation, which I think we don't need in order for this kid -- I shouldn't call him a kid, Your Honor. He started out as a kid. Now he's an

adult. Now he's a father. Now he's going to be a wife -- a husband. And just look at this man, and he's being as straight as he can with you.

That's all I have, Your Honor.

THE COURT: Thank you.

Mr. Bolling, what is the Government's recommendation?

MR. BOLLING: Your Honor, so we're obviously aware of all the extenuating and mitigating circumstances that apply.

THE COURT: And for the record, I have -- I did read all the letters that were submitted. I also reviewed all of the codefendants' documents in this case as well.

Thank you.

MR. BOLLING: Yes, Your Honor.

We're aware of the extenuating and mitigating circumstances applicable to Mr. Fazlollah, and with that said, you know, the Government entered into a plea agreement with a 46-month cap. Based upon the prior defendants who have been sentenced in this case, I suspected a variance may be in order here, but the problem is, Mr. Fazlollah is responsible for 53 firearms, and he's a recruiter.

The people who are getting probation in this case are defendants who have one, maybe two pistols which they purchased on behalf of the conspiracy. He's responsible for

53. So the problem he has is he's most comparable to probably Mr. Palomares Junior and Mr. Palomares-Leon. Palomares Junior had 49 guns and received a 27-month sentence. Palomares-Leon had less guns but was a recruiter and received a 33-month sentence.

The range you should be considering here is between 27 and 46 months for Mr. Fazlollah. He's a recruiter. He had 53 guns. Seven of those guns were recovered in Mexico at Mexican crime scenes. These firearms are not used for hunting. They are not used for sporting purposes. They are used to terrorize and murder Mexican citizens in the furtherance of the drug trade. That comes up here and poisons all of our United States residents.

The PSR's recommendation for 12 months and a day, which is really 10 months, is absolutely not appropriate. It is not reflective of the 3553(a) factors. Mr. Fazlollah has earned jail time, and you should give it to him.

Keep in mind, when you're talking about the number of 53 guns, that's enough to equip an entire United States Marine Corps infantry platoon and still have 10 left over.

THE COURT: Mr. Fazlollah, this is a very difficult case because obviously, as the Government has stated, the crime in and of itself is a very serious crime.

THE DEFENDANT: Yes, ma'am.

THE COURT: And as the Government has stated, then

you add your participation, and the number of weapons that you were involved with is even more egregious.

THE DEFENDANT: Yes, ma'am.

THE COURT: And as the Government has stated, I also -- one of the things I have to keep in mind in fashioning a sentence is making sure that similarly situated defendants are sentenced in the same manner. As the Government has said, you know, Mr. Palomares and Mr. Palomares Junior, they received, you know, 33 months, 27-month sentences.

You know, one of the most egregious parts about your case is that you recruited Mr. -- I think it's Gypsy or Gibson, and then he ended up with a -- Grigsby, Grigsby, high school football star, you know, young man, and he ended up with a felony on his record because of this. So I have to take that into consideration too, not only the harms that were caused by these guns, but also, you know, the harms to the community and to other defendants.

I'm very mindful about your situation. I commend you as to how well you've done. So I don't want you to think that I'm not taking that into consideration. I do commend you for how well you've done while you've been on supervision, and I commend you for maintaining your employment and for how you're raising your family. So I take that into consideration as well.

THE DEFENDANT: Yes, ma'am.

THE COURT: So I'm not going to give you the 33 months, but I'm not going to give you probation because I do think you do need to -- you know, punishment is of the -- one of the things I have to consider, and then deterrence, making sure other people know that, if they get involved in these types of crimes, then, you know, that's going to happen to them. They're going to go to prison.

So given all of the factors of sentencing, it is the judgment of the Court that Kyle Rene Fazlollah be committed to the custody of the Bureau of Prisons for a term of 10 months. You will receive credit for the time you have already served, any time you would have already served relating to this offense, and upon your release from imprisonment, you will be placed on supervised release to this Court for a period of three years.

You're to follow the standard conditions of supervision adopted by this Court in General Order 17-18, of particular importance that you not commit another federal, state, or local crime. You must also abide by the special conditions that you submit your person, property, house, vehicles, residence, office, papers, to a search to be conducted by the probation officer. Failure to submit to a search may be grounds for a revocation of your release, and you must warn other occupants that the premises may be searched pursuant to this condition.

You must cooperate in the collection of DNA as directed by the probation officer, and you must participate in a program of substance abuse treatment or -- which may include testing for substance abuse. If the treatment is inpatient and you object, you must notify the probation officer immediately. You must submit to substance abuse testing and not attempt to obstruct or tamper with the testing methods.

The Court -- I'm also going to order -- I'm not going to order that you pay a fine, but you have financial obligations. You have a lot of credit card debt --

THE DEFENDANT: Yes, ma'am.

THE COURT: -- and --

THE DEFENDANT: I -- oh.

THE COURT: So you need to -- I'm going to order that you, instead of the fine, that you maintain -- that you pay an amount of $300 a month towards your financial obligations, including your credit card debts. Do you understand? And any loans.

THE DEFENDANT: Is it okay if I pay it --

MR. AGUILAR: Let her speak.

THE DEFENDANT: Oh, I'm sorry, ma'am. Sorry about that.

THE COURT: That's okay. Did you have a question?

THE DEFENDANT: I was going to ask, is it okay if I pay it all just at once, or do I have to pay the $300 a month?

THE COURT: No, you can pay it all at once. If you can cover the debts, if you have the money to pay these credit card debts, then you can go ahead and do so. I'm also going to order that you not enter into any financial obligations over $250 unless you have the approval of the probation officer. And you'll get that approval once she sees -- he or she sees that you are making your payments towards your financial obligations.

THE DEFENDANT: Okay.

THE COURT: The Court -- you need to pay a special assessment fee of $100, and that will be due at a rate of $25 -- it's due immediately, so if you want to pay for it immediately you can, but it's due at a rate of $25 a month through the Bureau of Prisons Inmate Financial Responsibility Program.

Mr. Fazlollah, did you understand your sentence?

THE DEFENDANT: Yes, ma'am.

THE COURT: In your written plea agreement, you agreed to give up your right to appeal as long as I imposed a term within the agreement. I have done so, and therefore, your sentence is final here today, and I will not be informing you of your appellate rights.

Let me ask you, Mr. Aguilar, did you go over Mr. Fazlollah's conditions of supervision, both the general conditions and the special conditions?

MR. AGUILAR: Yes, Your Honor.

THE COURT: Are there any objections to any of these conditions?

MR. AGUILAR: No, Your Honor.

THE COURT: Also I am going to order that you serve the remainder of your time in the Safford area so that your family can be able to visit you.

THE DEFENDANT: Okay.

THE COURT: Anything further, Mr. Aguilar?

MR. AGUILAR: Just one matter, Your Honor. Can you remind Kyle, he now has lost his right to have any sort of access to --

THE COURT: Yes, thank you.

Mr. Fazlollah, and I noticed that you also had a case that was dismissed for a possession of a weapon. This is very important, and thank you for reminding me because I do remind especially people who have these gun cases. You have lost your privilege to own a gun or to be around any weapons, and I can't tell you enough how serious this is. If you are charged and convicted with a weapon violation or possession of a weapon, you are going to be facing many years in custody.

THE DEFENDANT: Yes, ma'am.

THE COURT: If you go to a state court and you get your rights restored, or even here in federal court, you get your rights restored, I doubt you will ever get your right

restored to possess a weapon.

Do you understand?

THE DEFENDANT: Yes, ma'am.

THE COURT: So even if a judge tells you that your rights are restored, you're not going to be able to own weapons. So it's very important that you understand that, because we see a lot of people that go into state court and get their rights restored. They're talking about their civil rights. They're talking about voting rights. They're not getting the right to have a gun again.

If I were you, I would be very careful as to where -- a car that I get into, because if there's a gun in that car, rest assured you're going to get blamed for it, and you're going to go to prison for it.

THE DEFENDANT: Yes, ma'am.

THE COURT: I would not let people in my house unless I knew absolutely that they didn't have weapons, and I wouldn't be around weapons. Otherwise you're risking going to prison for a very long time.

THE DEFENDANT: Yes, ma'am.

THE COURT: Do you understand?

THE DEFENDANT: Yes, ma'am.

THE COURT: And that's for the rest of your life. And you're very young, and you need to make sure that you're very conscious of that.

THE DEFENDANT: Yes, ma'am.

THE COURT: Anything further? Did you want -- did you want him turning himself in? Are you ready to turn yourself in?

THE DEFENDANT: I'm ready.

THE COURT: Any objection --

THE DEFENDANT: Yeah, I'm ready.

THE COURT: Thank you. I will remand you to the custody of the Marshal Service to begin serving your sentence. Also your passport will be released. Any objection to releasing the passport to his address on file?

MR. BOLLING: No, Your Honor, and the weapons have been administratively forfeited.

THE COURT: Thank you. So your passport will be released to the address that is on file, so you need to make sure that we have the correct address for you so that your passport will be mailed to you.

Anything further, Mr. Aguilar?

MR. AGUILAR: No, Your Honor, just other than, because he's agreeing to be brought into custody today, do we just deposit the pills for the U.S. Marshals Office?

THE DEFENDANT: My mom has the pills.

THE COURT: Marshal, how are you handling the medication? I think you need to --

DEPUTY UNITED STATES MARSHAL: I'll take them in

right now and you can call.

THE COURT: Okay. Thank you. If there is an issue with the medication while he's in custody, feel free to contact chambers.

MR. AGUILAR: All right. Thank you, Your Honor.

THE COURT: Thank you.

(Proceedings concluded in this matter.)

C E R T I F I C A T E

I, Erica R. McQuillen, Federal Official Realtime Reporter, in and for the United States District Court for the District of Arizona, do hereby certify that, pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 2nd day of July, 2024.

s/Erica R. McQuillen
Erica R. McQuillen, RDR, CRR
Federal Official Court Reporter